UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

LEONEL RUIZ, on behalf of his
daughter, E.R., a minor,
        Plaintiff,          **MEMORANDUM AND ORDER**

    - against -          13-CV-1241 (KAM)(SMG)

UNITED STATES OF AMERICA,
        Defendant.

------------------------------------X

**MATSUMOTO, United States District Judge:**

On March 8, 2013, Leonel Ruiz ("plaintiff"), on behalf
of his minor daughter, E.R., filed this action against the
United States ("defendant" or "Government"), pursuant to the
Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*,
claiming that on March 11, 2011, United States Customs and
Border Protection ("CBP") Officers improperly detained E.R., a
United States citizen who at the time was four years old, at
Washington Dulles International Airport ("Dulles") in Virginia
and "effectively deported" her to Guatemala following her
arrival at Dulles from Guatemala. (ECF No. 1, Complaint filed
3/8/13 ("Compl.").) Plaintiff brings claims of false
imprisonment, intentional infliction of emotional distress, and
negligence. (*See* Compl. at 13-16.) On October 23, 2013, the
United States moved to dismiss the complaint for lack of subject
matter jurisdiction pursuant to Federal Rule of Civil Procedure
12(b)(1), or, in the alternative, for judgment on the pleadings

under Federal Rule of Civil Procedure 12(c), or to transfer the case to the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a). (ECF No. 23, Motion to Dismiss filed 10/30/13 ("Gov't Mot."); ECF No. 23-1, Gov't Memorandum in Support of Motion to Dismiss filed 10/30/13 ("Gov't Br.").) Plaintiff opposes the Government's motions in their entirety. (ECF No. 24, Plaintiff's Opposition filed 10/30/13 ("Pl.'s Opp.").)

For the reasons stated herein, the court finds, based on the current record before the court, that the actions by the CBP Officers do not fall within the discretionary function exception to the Federal Tort Claims Act. Accordingly, defendant's motion to dismiss for lack of subject matter jurisdiction is respectfully denied without prejudice to renew based on a more fully developed record. The court further finds that defendant has shown by clear and convincing evidence that the interests of justice would be best served by transferring this case to the United States District Court for the Eastern District of Virginia, and accordingly, defendant's motion to transfer venue is granted. Defendant's remaining motion for judgment on the pleadings will be transferred to the Eastern District of Virginia.

## BACKGROUND

The facts, as stated in plaintiff's complaint and in other documents properly considered in the context of a Rule 12(b)(1) motion,[1] are as follows. E.R. was born in Long Island, New York on June 7, 2006. (Compl. at 3; ECF No. 23-2, AUSA Kolbe Declaration filed 10/30/13 ("Kolbe Decl."), Ex. A, at 14-15.) On February 12, 2010, E.R.'s parents, Leonel Ruiz ("Mr. Ruiz") and Brenda Dubon ("Ms. Dubon"), signed a document stating that E.R. was authorized to travel to and from Guatemala with her maternal grandfather, Luis Dubon ("Mr. Dubon"). (Kolbe Decl., Ex. E, "Autorizacion" dated 2/12/10.) The document was written in Spanish and notarized in Suffolk County, New York. (*Id.*) The document listed E.R.'s parents' names, passport numbers (but no country of citizenship), as well as a telephone number to call in case of an emergency. (*Id.*)

On October 22, 2010, when E.R. was four years old, her parents sent her to Guatemala for a winter vacation with her relatives, so that E.R. could spend time with her extended family, practice Spanish, and enjoy any health benefits from the warmer climate. (Compl. at 3.) Approximately five months later, on March 10, 2011, E.R. and Mr. Dubon boarded a TACA

---

[1] "Where subject matter jurisdiction is challenged . . . a court may consider materials outside the pleadings, such as affidavits, documents and testimony." *U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 449 (S.D.N.Y. 2001) (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)).

3

Airlines ("TACA") flight from Guatemala City, Guatemala, bound for John F. Kennedy International Airport ("JFK") in New York. (*Id.*) Due to inclement weather, the flight was diverted to Dulles, where E.R. and Mr. Dubon arrived between approximately 2:00 a.m. and 3:00 a.m. on March 11, 2011. (*Id.*)

At Dulles, E.R. and Mr. Dubon submitted their personal documents for inspection by CBP agents. E.R., who was traveling on her valid United States passport, was authorized to enter the United States at approximately 3:45 a.m. when the examining CBP Officer stamped her passport. (*Id.*) Mr. Dubon presented the notarized document authorizing him to travel with E.R. (*Id.*) The examining CBP Officer, finding "what he believed was an irregularity in Mr. Dubon's documentation," directed Mr. Dubon to a "secondary inspection area" pending further investigation to determine if he was admissible to the United States. (*Id.*) E.R. accompanied Mr. Dubon to this area. (*Id.*)

Plaintiff alleges that for nearly fourteen hours, CBP Officers continued to detain E.R. without contacting E.R.'s parents, despite Mr. Dubon's repeated requests to do so.[2] (Compl. at 5.) Mr. Dubon, who was determined by CBP officers to be a non-citizen and denied admission to the United States, "was

---

[2]   According to the Record of Deportable/Inadmissible Alien completed by a CBP Officer, "[a]ttempts to contact the parents of the minor were met with negative results. At about 17:30 hours, 11 March 2011 this office was able to contact the minor's father . . . ." (Kolbe Decl., Ex. C, Record of Deportable/Inadmissible Alien dated 3/11/11, at 2.)

4

not free to leave the secondary inspection area and enter the United States."[3]  (Compl. at 5; Kolbe Decl., Ex. C, Record of Deportable/Inadmissible Alien dated 3/11/11; Kolbe Decl., Ex. D, Determination of Inadmissibility dated 3/11/11.)  E.R., "as a minor, could not leave on her own."  (Compl. at 5-6.)  Plaintiff alleges that during their time in the holding area, E.R. and Mr. Dubon were "under CBP guard."  (Compl. at 6.)

Meanwhile, as he waited at JFK airport in New York on March 11, 2011, for the arrival of E.R. and Mr. Dubon, Mr. Ruiz eventually learned that the TACA flight originally bound for JFK had been diverted to Dulles, and that the passengers on that plane would be arriving at JFK at about 8:00 a.m. on March 11. (Compl. at 6.)  After E.R. did not arrive with the other TACA passengers, Mr. Ruiz eventually learned from a TACA employee that E.R. was "being held" at Dulles by CBP.  (*Id.*)

Later that day, at approximately 5:30 p.m., a CBP Officer contacted Mr. Ruiz on his cellular phone to notify him that Mr. Dubon was not permitted to enter the United States and would be sent back to Guatemala.  (*Id.*)  The CBP Officer also told Mr. Ruiz that E.R. was "being held" by CBP.  (*Id.*)  The CBP Officer asked for and was given Mr. Ruiz's name and other

---

[3]    CBP Officials determined that Mr. Dubon was a Guatemalan citizen, that he was not in possession of a valid visa or border crossing identification card, and that he had attempted fraudulently to procure admission into the United States by failing to disclose that he had previously been unlawfully present in the United States.  (*See* Determination of Inadmissibility.)

identifying information about Mr. Ruiz and his wife.  (*Id.* at
7.)  The CBP Officer informed Mr. Ruiz that E.R. would be sent
to JFK as soon as a suitable flight was found.  (*Id.*)

Plaintiff alleges that after the CBP Officer had
spoken to Mr. Ruiz by telephone, an unidentified woman
approached E.R. and "attempted to induce E.R. to leave her
grandfather."  (*Id.*)  As a result, E.R. "fear[ed] that she was
being taken from her family" and was "brought to tears."  (*Id.*)
E.R. continued to cry and refused to accompany the woman, who
soon left the area.  (*Id.* at 8.)  Soon thereafter, Mr. Dubon
began feeling unwell, and was taken to the emergency room at
Reston Hospital Center at approximately 6:30 p.m.  (*Id.*)  While
Mr. Dubon was at the hospital, E.R. was left with a different
unidentified woman, presumably a TACA employee.  (*Id.*)

At approximately 8:00 p.m., while Mr. Dubon was still
at the hospital, a CBP Officer again contacted Mr. Ruiz by
telephone.  (*Id.*)  Plaintiff alleges that the CBP Officer told
Mr. Ruiz he could not send E.R. on a flight to New York because
"he was not allowed to return E.R. to 'illegals.'"  (*Id.* at 8-
9.)  Mr. Ruiz gave consent to return E.R. to Guatemala with her
grandfather.  (*Id.* at 9.)  Plaintiff alleges that CBP Officers
"forced" Mr. Ruiz into giving consent to send E.R. to Guatemala
by "threatening that otherwise CBP would send E.R. to an
"'adoption center'" in Virginia.  (*Id.*)  After the telephone

call, at approximately 9:30 p.m., Mr. Dubon returned to Dulles airport from the hospital. (*Id.* at 8.)

E.R. and Mr. Dubon left for Guatemala on an early morning flight on March 12, 2011. (*Id.* at 11.) Plaintiff alleges that while E.R. was "detained" at Dulles, she was not given adequate food or drink and was fed only a cookie and a soda. (*Id.* at 10.) In addition, plaintiff alleges that E.R. was barely able to sleep in the cold room, and that CBP Officers failed to provide her with a blanket or pillow. (*Id.*)

On March 29, 2011, plaintiff flew back to the United States accompanied by a "local attorney." (*Id.* at 11.) On April 8, 2011, E.R. met with a child psychologist in New York, Dr. Roy Aranda, who concluded that the March 11, 2011 incident had traumatized E.R., and diagnosed E.R. with Posttraumatic Stress Disorder ("PTSD"). (*Id.* at 12.)[4] Plaintiff now resides in Guatemala, with no current plans to return to the United States. (ECF No. 31, Letter from Plaintiff's Counsel dated 9/2/14.)

## DISCUSSION

---

[4] Plaintiff alleges that during E.R.'s "forced stay" in Guatemala, she had bouts of hysterical crying and refused to speak to Mr. Ruiz over the telephone because she believed he had not wanted to come to the airport to pick her up. (*Id.* at 11.) After E.R. returned to the United States, she "began to overeat, throw tantrums, and soil her pants," hid when people knocked on the front door, refused to let go of her father's hand when outside the house, and became frightened when the lights were off at night. (*Id.* at 12.)

## I. Discretionary Function Exception and Subject Matter Jurisdiction

Plaintiff brings this suit pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, which waives the sovereign immunity of the United States in limited circumstances. In relevant part, the FTCA authorizes suits against the federal government to recover damages

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Title 28 U.S.C. § 1346(b)(1).

One of the exceptions to the FTCA's waiver of sovereign immunity is the "discretionary function exception," which provides that Congress's authorization to sue the United States for damages does not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities

from exposure to suit by private individuals.'" *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)).  Because the FTCA operates as a grant of subject matter jurisdiction to the federal courts, "a finding that the discretionary function exception applies is tantamount to holding that the court lacks jurisdiction." *Caban v. United States*, 671 F.2d 1230, 1235 n.5 (2d Cir. 1982).

Here, defendant moves, *inter alia*, pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") to dismiss plaintiff's FTCA claims on the grounds that the actions of the CBP Officers fall within the discretionary function exception, and that accordingly, the court lacks subject matter jurisdiction.  (*See generally* Gov't Br.)

The plaintiff bears the burden of establishing, by a preponderance of the evidence, that the court retains authority to adjudicate a case.  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Loew v. U.S. Postal Serv.*, No. 03-CV-5244, 2007 WL 2782768, at *4 (E.D.N.Y. Feb. 9, 2007).  Generally, a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is reviewed under the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6), which requires a court to accept as true the facts alleged in the

complaint, and to draw all reasonable inferences in favor of the plaintiff. *Loew*, 2007 WL 2782768, at *4. Where, however, "the jurisdictional challenge is based on the FTCA, the government receives the benefit of any ambiguities." *Id.; Moreno v. United States*, 965 F. Supp. 521, 524 (S.D.N.Y. 1997) ("Because the FTCA creates a waiver of sovereign immunity, it is strictly construed and all ambiguities are resolved in favor of the United States."). Subject matter jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (internal quotation marks and citation omitted). A plaintiff bears "the initial burden to state a claim that is not barred by the DFE."[5] *Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013); *see Wang v. United States*, 61 F. App'x 757, 759 (2d Cir. 2003) ("Plaintiffs failed to meet their initial burden of pleading

---

[5]     Neither the Second Circuit nor the United States Supreme Court has explicitly answered whether the United States or a plaintiff bears the ultimate burden of proving the applicability of the discretionary function exception. *See* 14 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3658.1 (3d ed. 1998) (collecting cases). Other courts have held that the government bears the burden of proving that the exception applies. *See, e.g., id.; Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 n.5 (E.D.N.Y. 2009) (noting that once a plaintiff satisfies the pleading requirement to allege facts which would support a finding that the challenged actions fall outside the exception, the burden shifts to the government to prove that the exception applies); *Moltchatsky v. United States*, 778 F. Supp. 2d 421, 431 (S.D.N.Y. 2011) (same); *King v. United States*, 491 F. Supp. 2d 286, 296 (D. Conn. 2007); *Carboniero v. United States*, 211 F.3d 749, 756 n.5 (3d Cir. 2000).

facts which would support a finding that the conduct of the investigative agents fell outside the scope of the exception.").

**A.    Two-Pronged Discretionary Function Exception Test**

Under the Supreme Court's *Gaubert* test, the discretionary function exception precludes suits against the United States "only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in questions must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991) and *Berkovitz*, 486 U.S. at 536-37)).

Under the first prong of the test, "it is the nature of the conduct, rather than the status of the actor" that determines whether a challenged act is discretionary. *Gaubert*, 499 U.S. at 322.  If there exists a mandatory federal statute, regulation, or policy that "specifically prescribes a course of conduct for an employee to follow," the first prong of the test requiring an element of judgment or choice is not met because "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536.  If there is no established explicit or implicit governmental policy, or if a

policy allows a government agent to exercise discretion, then under the second prong of the *Gaubert* test, the court must determine whether the conduct "can be said to be grounded in the policy of the regulatory regime," focusing "not on the agent's subjective intent . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. If there exists a regulation allowing an employee discretion, the "very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324 (internal citation omitted).

If the challenged conduct involved an element of judgment or choice, then under the second prong of the discretionary function exception test, that judgment or choice must be grounded in considerations of public policy or susceptible to policy analysis to be protected by the discretionary function exception. *See Coulthurst*, 214 F.3d at 109; *Gaubert*, 499 U.S. at 325-25; *Varig Airlines*, 467 U.S. at 814 (noting that the discretionary function exception is intended to shield from "judicial second-guessing" judgments "grounded in social, economic, and political policy"). Accordingly, the second prong of the test distinguishes between discretionary decisions that are grounded in public policy

considerations, and decisions that are made out of carelessness or laziness. *Gaubert*, 499 U.S. at 324-25, 325 n.7 (remarking that while a government agent who drives a car while on a government mission exercises "discretion" in driving the car, any decisions made to drive the car are not grounded in public policy, and therefore the discretionary function exception would not protect negligent driving).

**B.    Application of Discretionary Function Test**

Plaintiff's complaint raises claims of (1) false imprisonment based on, *inter alia*, the CBP Officers' alleged detention of E.R. for more than twenty hours, refusal to contact E.R.'s parents and to allow her to continue to New York after she was admitted to the United States, and the decision to send E.R. back to Guatemala; (2) intentional infliction of emotional distress based on the above actions, as well as the CBP Officers' alleged threat to send E.R. to an adoption center, the deprivation of food and water, and keeping E.R. in unsuitable conditions for a four-year-old child; and (3) negligence, based on the conditions in which E.R. was kept and the CBP Officers' alleged refusal to contact E.R's parents.

Applying the discretionary function exception test as set forth in *Gaubert*, the court first finds that the CBP Officers' *initial* decision to detain Mr. Dubon after he failed to establish his entitlement to enter the United States was not

discretionary.  Under the relevant provision of the Immigration
and Nationality Act ("INA"), if an immigration officer
"determines that an alien . . . who is arriving . . . is
inadmissible . . . the officer *shall order the alien removed* . .
. without further hearing or review."  8 U.S.C. §
1225(b)(1)(A)(i) (emphasis added).  Thus, because the statute
mandates "particular conduct, and the employee obey[ed] the
direction, the Government will be protected because the action
will be deemed in furtherance of the policies which led to the
promulgation of the regulation."  *Gaubert*, 499 U.S. at 324.
Similarly, the CBP Officers' decision to admit E.R. into the
country once they determined she was a citizen traveling on a
valid passport was required under the law and was not
discretionary, which neither party has disputed.  *See Caban*, 671
F.2d at 1234 (noting the "basically mechanical duty to ascertain
whether an applicant meets the minimal standards for entry into
this country" is not protected by the discretionary function
exception).

By contrast, under *Gaubert* and *Caban*, the decision to
keep E.R. with Mr. Dubon while performing a secondary inspection
of Mr. Dubon, the alleged failure to contact E.R.'s parents for
fourteen hours and to provide adequate food and care for E.R.
during the approximately twenty hours she spent in the secondary
area, the alleged refusal to send E.R. on the next flight to JFK

to reunite with her parents, and the CBP Officers' alleged decision to provide Mr. Ruiz one hour to decide whether to send E.R. back to Guatemala or to an "adoption center," do not fall within the discretionary function exception. Absent from this record are any discernible social, economic, or political policy considerations in the regulatory or statutory regime that would explain the CBP Officers' decisions after they moved E.R. and Mr. Dubon to the secondary area.

Plaintiff argues that CBP's treatment of E.R. violated the *Flores v. Reno* Settlement Agreement (the "*Flores* Agreement") regarding the detention of minors, as well as its own internal policies, including the Office of Border Protection's "Hold Room and Short Term Custody" policy and the Office of Field Operations' "Secure Detention, Transport and Escort Procedures at Ports of Entry." (*Id.*; Pl.'s Opp. at 8-9.) Under *Gaubert*, violations of mandatory law or regulation by government officials fall outside the discretionary function exception. 499 U.S. at 324.

The *Flores* Agreement is a class action settlement agreement from *Flores v. Meese*, No. 85-cv-4544 (C.D. Cal. Sept. 16, 1996), and it is binding on the Department of Homeland Security, which includes CBP. *See Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *2 (W.D. Tex. Apr. 9, 2007) (summarizing history and provisions of *Flores*

Agremeent); *Flores v. Meese* Stipulated Settlement Agreement dated 1/17/97 ("*Flores* Agreement"), Case No. 85-CV-4544-RJK, *available at* https://www.aclu.org/sites/ default/files/ assets/ flores_settlement_final_plus_extension_of_settlement011797.pdf. Although the *Flores* Agreement "was intended as a stopgap measure until the United States could promulgate reasonable, binding standards for the detention of minor[s]," in remains the "only binding legal standard directly applicable to the detention of minor aliens by the United States government." *Bunikyte*, 2007 WL 1074070, at *2. The *Flores* Agreement sets forth policy and conditions of confinement relating to the detention, treatment, and release of unaccompanied minors in CBP custody. *See generally Flores* Agreement. Although the Agreement arose out of a case challenging the detention standards of alien minors in government custody, by its terms it applies to "any person under the age of eighteen (18) years who is detained in the legal custody of the INS" or successor organizations. *Id.* ¶ 4. Relevant here, the *Flores* Agreement requires minors to be held in facilities that provide access to "drinking water and food as appropriate," as well as "adequate temperature control and ventilation." *Flores* Agreement ¶ 12A. The Agreement also expresses an explicit policy favoring the release of minors to their parent or legal guardian. *Flores* Agreement ¶ 14.

To comply with the *Flores* Agreement, the CBP has established internal policies. The CBP's "Hold Room and Short Term Custody" policy ("Short Term Custody Policy"), issued in 2008, establishes the "national policy for the short-term custody of persons arrested or detained by Border Patrol Agents and detained in hold rooms . . . at facilities that are under the control of U.S. Customs and Border Protection." *See* CBP "Hold Rooms and Short Term Custody Policy" (2008) ¶ 1, *available at* http://foiarr.cbp.gov/ streamingWord.asp?i=378 (last accessed Sept. 15, 2014). According to the policy, meals must be offered to juvenile detainees every six hours, and two of three meals must be hot. Short Term Custody Policy ¶ 6.8. Juvenile detainees must also be offered regular access to snacks, milk, and juice. *Id*. Similarly, the CBP's "Secure Detention, Transport, and Escort Procedures at Ports of Entry" policy includes requirements for juveniles to have access to meals, snacks, and drinks at any time. *See* Department of Homeland Security, Office of Inspector General, *CBP's Handling of Unaccompanied Alien Children Report*, Sept. 9, 2010, at 5, *available at* http://www.oig.dhs.gov/assets/ Mgmt/OIG_10-117_Sep10.pdf (last accessed Sept. 15, 2014).

Here, plaintiff alleges that CBP Officers refused to contact E.R.'s parents for fourteen hours, that E.R. was fed only a cookie and a soda during the twenty hour period, and that

she was not provided with a blanket or pillow in the cold holding area.  (Compl. at 10.)  Thus, as alleged by plaintiff, the CBP Officers at Dulles airport failed to follow the explicit policies and procedures of the *Flores* Agreement and the CBP's internal policies.  It is immaterial whether the policies allow room for discretion to act, because the result under *Gaubert* is the same.  If the policies allow no room for discretion and are mandatory, and the employee violates the mandatory regulation, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 324.

If there is no established governmental policy, or if policies allow a government agent to exercise discretion, then under the second prong of the *Gaubert* test, the court must determine whether the conduct "can be said to be grounded in the policy of the regulatory regime," focusing "not on the agent's subjective intent . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Id.* at 325.

Here, the Government has not disputed that the standard of care expressed in the *Flores* Agreement and the CBP's internal policies apply to the CBP Officers' treatment of E.R. in providing proper food, drink, and care.  (*See generally* Gov't Br.; ECF No. 25, Gov't Reply filed 10/30/13 ("Gov't Reply").)

Consequently, the court finds that the CBP Officers failed to follow a clear directive to reunite E.R. with her parents without unnecessary delay and failed to provide a meal to E.R. every six hours, and that the discretionary function exception cannot apply to plaintiff's negligence claim based on this record.

Moreover, even if the binding guidance set by the *Flores* Agreement and the CBP's internal policies did not apply to the circumstances here, or permitted the CBP Officers to exercise discretion, the court would still find that under the second prong of the discretionary function test, the CBP Officers' treatment of E.R. during the approximate twenty-hour period, cannot be said to be susceptible to policy analysis. The court cannot discern how deciding to wait fourteen hours before contacting E.R.'s parents and to only provide the child with a cookie and a soda over twenty hours could constitute a considered judgment grounded in social, economic, or political policies. *See Gaubert*, 499 U.S. at 323. Indeed, the Government has not offered any reason as to why the CBP Officers' actions in this regard were justified by or susceptible to policy analysis. Rather, based on plaintiff's allegations, the CBP Officers' actions appear more plausibly to be the result of negligence or laziness, and these acts do not warrant the application of the discretionary function exception.

*Coulthurst*, 214 F.3d at 112 (holding that prison officials'
"absent-minded or lazy" decisions in failing to inspect prison
exercise equipment, as alleged by the complaint, "are examples
of negligence . . . that do not involve considerations of public
policy" (internal citation and quotation marks omitted));
*Gaubert*, 499 U.S. at 325 n.7 (explaining that a government
official's negligent driving of a car while on official business
clearly falls outside the discretionary function exception as it
is not grounded in public policy considerations).

     In addition, plaintiff also seeks to hold the
Government liable for the CBP Officers' alleged "deportation" of
E.R.  As alleged by plaintiff, CBP Officers told E.R.'s father
that he had less than an hour to decide whether to allow them to
send E.R. to Guatemala with her grandfather, or they would send
E.R. to an "adoption center."  (Compl. at 9.)  According to the
allegations in the complaint, the CBP Officer told Mr. Ruiz that
he could not send E.R. on a flight to New York because "he was
*not allowed* to return E.R. to 'illegals.'"  (Compl. at 8-9
(emphasis added).)

     The Government fails to identify any policy, guideline
or regulation relating to the situation of an admitted minor
U.S. citizen being separated from her parents that would justify
the application of the discretionary function exception, and
offers no authority as to why CBP Officers could properly

exercise discretion by simply refusing to reunite a verified

U.S. minor citizen with her biological and legal parents.

Indeed, despite the Government's arguments to the contrary, it

appears that the CBP Officers did not question the identity of

Mr. Ruiz as E.R.'s father, as they first promised to reunite

E.R. by sending her on a flight from Dulles to JFK, then reneged

and obtained his permission to send E.R. back to Guatemala.

(Compl. at 9.)

Thus, based on the record before the court and the

allegations in the complaint being accepted as true for the

purposes of this motion, and absent any explanation as to how

discretion was being exercised by the government or pursuant to

what governmental regulatory policy, the court holds that the

discretionary function exception does not apply to plaintiff's

claims regarding the treatment of E.R. during the time she spent

in the secondary area at Dulles.  Accordingly, the court finds

there is subject matter jurisdiction to proceed, and denies the

Government's motion to dismiss under Rule 12(b)(1).

## II.  Motion to Transfer Venue

The Government requests, in the alternative, to

transfer venue to the United States District Court for the

Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a).[6]

---

[6] The Government also argues that venue is not proper in the Eastern District
of New York. (Gov't Br. at 18-19.)  The court, however, disagrees, as E.R. is

(Gov't Br. at 20-24.)  Plaintiff opposes the motion to transfer
venue.  (Pl.'s Opp. at 23-30.)

Under 28 U.S.C. § 1404(a), "[f]or the convenience of
parties and witnesses, and in the interest of justice, a
district court may transfer any civil action to any other
district or division where it might have been brought."  28
U.S.C. § 1404(a).  Section 1404(a) "is intended to prevent waste
of time, energy and money and to protect litigants, witnesses
and the public against unnecessary inconvenience and expense."
*Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246,
250 (E.D.N.Y. 2010) (internal quotation marks, brackets, and
citation omitted).  A district court has "broad discretion in
making determinations of convenience under Section 1404(a) and
notions of convenience and fairness are considered on a case-by-
case basis."  *Romano v. Banc of Am. Ins. Servs.*, 528 F. Supp. 2d
127, 129 (E.D.N.Y. 2007) (quoting *D.H. Blair & Co, Inc. v.
Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006)) (internal quotation
marks omitted).  The party seeking transfer "carries the burden
of making out a strong case for transfer" by clear and
convincing evidence.  *N.Y. Marine & Gen. Ins. Co. v. Lafarge N.
Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (quoting *Filmline*

---

the real party in interest whose residency, at the time the action is
commenced, is relevant for purposes of venue.  28 U.S.C. § 1402(b) ("Any
civil action on a tort claim against the United States . . . may be
prosecuted only in the judicial district where the plaintiff resides or
wherein the act or omission complained of occurred.").

*(Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d
513, 521 (2d Cir. 1989)) (internal quotation marks omitted).

In determining whether to transfer venue, a district
court may only transfer if "(1) the plaintiff could have brought
the case initially in the proposed transferee forum; and (2) the
transfer would promote the convenience of the parties and
witnesses and would be in the interests of justice." *Coker v.
Bank of Am.*, 984 F. Supp. 757, 764 (S.D.N.Y. 1997) (internal
quotation marks and citation omitted). The factors to be
considered in determining whether to grant a motion to transfer
venue include: "(1) the plaintiff's choice of forum, (2) the
convenience of witnesses, (3) the location of relevant documents
and relative ease of access to sources of proof, (4) the
convenience of parties, (5) the locus of operative facts, (6)
the availability of process to compel the attendance of
unwilling witnesses, and (7) the relative means of the parties."
*Lafarge N. Am.*, 599 F.3d at 112; *Rindfleisch*, 752 F. Supp. 2d at
250-51. Other factors that may be considered include the
desirability of having the case tried by a forum familiar with
the substantive law to be applied, and the interests of justice.
*Modern Computer Corp. v. Ma*, 862 F. Supp. 938, 948 (E.D.N.Y.
1994). No single factor is dispositive and there is no set
formula for how to apply them; instead, they should be applied

and weighed in the context of each particular case.
*Rindfleisch*, 752 F. Supp. 2d at 250-51.

First, regarding whether plaintiff could have
initially brought this FTCA action in the Eastern District of
Virginia, the court answers in the affirmative.  Under the
relevant provisions of the FTCA governing venue, the Government
can be sued "in the judicial district where the plaintiff
resides or wherein the act or omission complained of occurred."
28 U.S.C. § 1402(b).  Although E.R.'s residence was in the
Eastern District of New York at the time the complaint was
filed, the alleged acts occurred at Dulles airport in the
Eastern District of New York.

As to whether transferring this action to the Eastern
District of Virginia would promote the convenience of parties
and witnesses and serve the interests of justice, the court
turns to the discretionary factors.

## A. Plaintiff's Choice of Forum

Plaintiff chose to bring this action in the Eastern
District of New York rather than in the Eastern District of
Virginia.  Although a plaintiff's choice of forum is generally
accorded some weight, it "is not entitled to the weight
generally accorded such a decision where there is lacking any
material connection or significant contact between the forum and

24

the events allegedly underlying the cause of action." *Cain v. N.Y.S. Bd. of Elections*, 630 F. Supp. 221, 227 (E.D.N.Y. 1986); *accord. Hernandez v. Graebel Van Lines*, 761 F. Supp. 983, 990 (E.D.N.Y. 1991). Moreover, the weight given to the plaintiff's choice is less "in the transfer context than in a *forum non conveniens* motion, since a transfer motion does not seek dismissal of the complaint." *Jones v. United States*, No. 02 CV 1017, 2002 WL 2003191, at *2 (E.D.N.Y. Aug. 26, 2002) (granting motion to transfer venue to Southern District of Georgia in an FTCA case where plaintiff, a New York resident, alleged that he had received inadequate medical care during his incarceration in a Georgia facility).

Therefore, although the court gives some weight to plaintiff's choice of forum, and finds that it weighs against transfer, the court does not give plaintiff's choice great deference.

### B.    Convenience of Parties and Witnesses and Availability of Process to Compel Attendance of Unwilling Witnesses

The convenience of party and non-party witnesses "is probably considered the single most important factor in the analysis of whether a transfer should be granted." *Coker*, 984 F. Supp. at 765; *Neil Bros. Ltd. v. World Wide Lines, Inc.*, 425 F. Supp. 2d 325, 329 (E.D.N.Y. 2006). "The logical relevant starting point in determining the convenience of the parties is

their residence." *Neil Bros. Ltd.*, 425 F. Supp. 2d at 328.

Because the "core" inquiry under § 1404(a) is where the "center

of gravity of the litigation" is located, courts "routinely

transfer cases when the principal events occurred, and the

principal witnesses are located, in another district." *Viacom

Int'l, Inc. v. Melvin Simon Prods., Inc.*, 774 F. Supp. 858,

868 (S.D.N.Y. 1991). Generally, to support a motion to transfer

based on the convenience of the parties and witnesses, the

movant submits affidavits of "the potential principal witnesses

expected to be called and a general statement of the substance

of their testimony." *Laumann Mfg. Corp. v. Castings USA, Inc.*,

913 F. Supp. 712, 720 (E.D.N.Y. 1996) (internal quotation marks

and citation omitted); *Factors Etc., Inc. v. Pro Arts, Inc.*, 579

F.2d 215, 218 (2d Cir. 1978), *abrogated on other grounds by

Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990).

Here, defendant has identified eight witnesses, CBP

Officers, who have first-hand knowledge about the events that

occurred at Dulles airport and which gave rise to plaintiff's

FTCA claims.[7] (*See* Kolbe Decl., Ex. F, Affidavits of Potential

Witnesses.) None of the Government's eight witnesses resides in

---

[7]     Plaintiff argues that defendant's submitted affidavits do not
adequately apprise the court of the witnesses' likely testimony or its
probative value. (Pl.'s Opp. at 25-26.) The court, however, disagrees, as
only a "general statement of the substance of their testimony" is required.
*See Laumann Mfg. Corp.*, 913 F. Supp. at 720 (emphasis added). The court
finds that the affidavits adequately explain each witness's role in the
alleged events and the general subjects about which each witness would
testify.

the Eastern District of New York; indeed, all but one are "stationed" in the Eastern District of Virginia and do not routinely travel to the Eastern District of New York for work. (*Id.*) At the time the complaint was filed, only E.R., her parents, and Dr. Aranda resided in the Eastern District of New York, and only E.R. and Mr. Ruiz witnessed or were a part of any of the events at Dulles airport. (*See generally* Compl.) Moreover, E.R. has since moved to Guatemala and presently has no plans to return to the Eastern District of New York. (ECF No. 31, Letter from Plaintiff's Counsel dated 9/2/14.) Accordingly, because only two potential witnesses, Mr. Ruiz and Dr. Aranda, currently reside in the Eastern District of New York, eight potential witnesses reside in or near the Eastern District of Virginia, and E.R. does not reside in the United States, the convenience of the parties and witnesses weighs heavily in favor of transfer.

As to the availability of process to compel the attendance of unwilling witnesses, under Federal Rule of Civil Procedure 45(c)(3)(B)(ii), a district court can only subpoena non-party witnesses that are within its district or within 100 miles of the district. A district court must quash or modify a subpoena that would require a person to travel beyond the geographical limits of Rule 45(c). Fed. R. Civ. P. 45(d)(3)(A)(ii). This factor is "generally relevant only with

respect to third-party witnesses, because employee witnesses are subject to compulsory process in either forum by virtue of their employment relationship with a party." *Pecorino v. Vutec Corp.*, 934 F. Supp. 2d 422, 443 (internal quotation marks and citation omitted); *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006).

Here, the only identified non-party witness is Dr. Aranda, whom plaintiff appears to rely upon for his expertise in assessing plaintiff's mental and emotional condition. Neither party has provided any affidavits stating that any prospective non-party witnesses would not appear if this case remained in the Eastern District of New York or were transferred to the Eastern District of Virginia. Accordingly, this factor is neutral.

### D. Locus of Operative Facts and Relative Ease of Access to Sources of Proof

The locus of operative facts is a "primary factor" in a motion to transfer venue. *Fuji Photo Film*, 415 F. Supp. 2d at 375 (citing *ZPC 2000, Inc. v. SCA Grp., Inc.*, 86 F. Supp. 2d 274, 279 (S.D.N.Y. 2000)). When determining the locus of operative facts, a district court "must look to the site of events from which the claim arises." *Pecorino*, 934 F. Supp. 2d at 440 (internal quotation marks and citation omitted). This factor "includes consideration of the relative ease of access to

the sources of proof." *Pall Corp. v. PTI Techs., Inc.*, 992 F.
Supp. 196, 200 (E.D.N.Y. 1998) (citations omitted).  If the
"'principal events occurred and the principal witnesses are
located in another district,' the locus of facts provides a
strong reason to transfer." *Jones*, 2002 WL 2003191, at *3
(quoting *Berman v. Informix*, 30 F. Supp. 2d 653, 658 (S.D.N.Y.
1998)).

        Here, all the events giving rise to plaintiff's FTCA
claim occurred at Dulles airport in the Eastern District of
Virginia, and as discussed *supra*, eight potential witnesses are
located in or near the Eastern District of Virginia.  Thus,
"virtually all of the witnesses, documents, and events critical
to the litigation" are in the Eastern District of Virginia.
*Larca v. United States*, No. 11 Civ. 3952, 2012 WL 6720910, at *3
(S.D.N.Y. Dec. 16, 2012) (transferring plaintiff's FTCA suit
from the Southern District of New York to the Northern District
of Ohio, where alleged events occurred).  Plaintiff argues that
E.R.'s contact with Virginia was "serendipitous" and that she
had "no reasonable expectation that she would be forced to
litigate in Virginia to vindicate her rights." (Pl.'s Opp. at
27-28.)  This argument, however, is unavailing, as many courts
have transferred cases to different venues despite only a
"serendipitous" encounter between the plaintiff and the
transferee forum.  *See, e.g.*, *Larca*, 2012 WL 6720910, at *3

(transferring venue from New York to Ohio where plaintiff, a New York resident, received medical treatment while incarcerated in Ohio, and "little or nothing connects this case to New York other than Plaintiff's domicile"); *Jones*, 2002 WL 2003191, at *1 (transferring FTCA case from New York to Georgia where the basis of plaintiff's claims alleging medical mistreatment occurred after he was transferred to Georgia prison). Moreover, plaintiff has not cited any binding legal authority to support this contention. Thus, even recognizing that the physical evidence in this case would likely consist of documents that are easily transferred via electronic means, this primary factor still weighs heavily in favor of transfer.

### E. Relative Means of Parties

A party opposing transfer because of inadequate means "'must offer documentation to show that transfer . . . would be unduly burdensome to his finances.'" *Jones*, 2002 WL 2003191, at *3 (quoting *Advance Relocation & Storage, Inc. v. Wheaton Van Lines, Inc.*, No. 99-2491, 2000 WL 33155640, at *8 (E.D.N.Y. Sept. 15, 2000)). Here, plaintiff has filed a declaration stating that "[t]his action was commenced in the Eastern District of New York because it is the district in which E.R. lives, and where it will be least costly and least difficult for Mr. Ruiz and E.R. to maintain this action." (ECF No. 28, Shapiro Declaration dated 10/16/13 ("Shapiro Decl."), at 2.)

The declaration also states that "[t]he costs of travel to the Eastern District of Virginia to participate in this lawsuit would be financially burdensome for E.R.'s family." (*Id.*) As stated before, E.R. no longer lives in the United States and has no plans to return. However, the court also presumes that Mr. Ruiz's means are modest compared to the United States. *See Jones*, 2002 WL 2003191, at *3. Accordingly, this factor weighs against transfer.

### F. Desirability of Having Case Tried by Forum Familiar with Substantive Law to be Applied

While this factor is not a significant one, particularly where an action "does not involve complex questions," *Schwartz v. Marriott Hotel Servs., Inc.*, 186 F. Supp. 2d 245, 251 (E.D.N.Y. 2002), it is nevertheless "judicially desirable to have cases decided by a court familiar with the substantive law to be applied." *Hernandez*, 761 F. Supp. at 991; *see also Kreisner v. Hilton Hotel Corp.*, 468 F. Supp. 176, 179 (E.D.N.Y. 1979) ("While there may not be novel or complex issues of State law to be resolved, construction of State law is best left to courts most familiar with it."). Under the FTCA, a district court applies "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), which the parties agree is Virginia state law. (*See* Gov't Br. at 24; Pl.'s Opp. at 29.)

Because a federal district court sitting in the Eastern District of Virginia would "certainly be more familiar with [Virginia] law than a district court sitting in New York," *Jones*, 2002 WL 2003191, at *4, this factor weighs in favor of transfer.

## G. Interests of Justice

Balancing all of the factors set forth above, the court concludes that the Government has clearly shown that the interests of justice would be best served by transferring this case to the Eastern District of Virginia, where all the actions giving rise to plaintiff's FTCA claims occurred, the vast majority of witnesses are located, and which is more familiar with the substantive state law to be applied. Little connects this case to the Eastern District of New York other than that it is E.R.'s father's and Dr. Aranda's domicile.

Consequently, the Government's motion to transfer venue to the Eastern District of Virginia is granted.

**CONCLUSION**

For the foregoing reasons, the court respectfully **denies** the Government's motion to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1), and **grants** the Government's motion to transfer venue to the Eastern District of Virginia under 28 U.S.C. § 1404(a). The

Government's motion for judgment on the pleadings shall be transferred to the Eastern District of Virginia.  The Clerk of Court is respectfully requested to transfer the case to the United States District Court for the Eastern District of Virginia.

**SO ORDERED.**

Dated:      September 18, 2014
            Brooklyn, New York

                                    _____/s/_____
                                    **KIYO A. MATSUMOTO**
                                    United States District Judge
                                    Eastern District of New York